UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHORELINE FOUNDATION, et al.,

       Plaintiffs,

v.

CITY OF MUSKEGON, et al.,

       Defendants.
_____/

CASE NO. 1:11-cv-343

HON. ROBERT J. JONKER

**OPINION AND ORDER**

On August 3, 2012, the Court held a hearing on Defendants' Motion for Summary Judgment (the "Motion"). (docket # 17.) At the hearing, the Court ruled on all of Plaintiffs' claims except Plaintiffs' class-of-one Equal Protection Clause claim against the City of Muskegon (the "City"), the Muskegon City Commission (the "Commission"), and the individual Defendants in their respective official capacities only. The Court took this claim under advisement to enable the Court to further consider the arguments and cases raised at the hearing. After reviewing all matters of record, including the parties' respective briefs on the class-of-one issue, and for the reasons set forth below, the Court **GRANTS** Defendants' Motion for Summary Judgment (docket # 17) on Plaintiffs' remaining class-of-one claim against Defendants.

**FACTUAL BACKGROUND**

This case arises out of Defendants' handling of the permit approval and oversight for Shoreline Spectacular, a Labor Day festival that has been held in Muskegon, Michigan for over 20 years (the "Festival"). (Verified Compl., docket # 1, at ¶ 13.) FUN, Inc. operated the Festival through 2008, but did not conduct the Festival in 2009 due to financial hardship. FUN ultimately

granted the ownership rights to the Festival, including the name, to Plaintiff Pamela Carey. (*Id.* at ¶ 14.) Ms. Carey created Plaintiff Shoreline Foundation, Inc., as a 501(c)(3) non-profit to promote the Festival and disburse profits from the Festival to local charities. (*Id.*) Plaintiffs allege that Defendants violated her Equal Protection rights in how they handled the permitting process for the 2010 Festival, how they policed and regulated the Festival during Labor Day weekend, and how the Commission handled its permit application the following year, which ultimately ended with Plaintiffs' application being denied based on an outstanding unpaid balance due for City services rendered in 2010. (*Id.* at ¶ 226.) In 2011, the Festival was ultimately held in a neighboring town.

In February 2010, Plaintiffs submitted an application to host the Festival over Labor Day weekend. (*Id.* at ¶ 36.) Shortly thereafter, in March 2010, the Breakwater Group expressed interest to the Commission in holding a competing Labor Day festival of its own. (docket ## 29-1, 29-4.) Defendants acknowledge that "some or all of the promoters of the Breakwater Festival had personal relationships, friendships, prior or current business relationships, or other similar ties or connections to any or all of the named Defendants in this action." (docket # 28-1, at 4.) For example, Defendant Steve Warmington, the Muskegon Mayor, served on several festival boards with the Breakwater Group founders. (*Id.*) In an effort to resolve the competition between the two festivals amicably, the Commission left the festival promoters to attempt to reconcile their differences, but they were unable to do so, as indicated in several email exchanges in April 2010. (docket # 1, at ¶ 47–48; docket # 29-4.)

The City's Leisure Board ultimately approved three events to occur during Labor Day weekend 2010: (1) Plaintiff's Shoreline Spectacular Festival, which was granted use of downtown Muskegon between 4th and 7th Streets; (2) the Breakwater Festival, which was given the right to set

2

up at Pere Marquette along the Muskegon shoreline, where Plaintiff's Festival had traditionally been located; and (3) the Labor Day Parade, which was to run through the Shoreline Spectacular, but not Breakwater. (docket # 1, at ¶ 67–72.) At all times relevant to this litigation, Defendant Cathy Burbaker-Clarke was the Leisure Board's Director. (*Id.* at ¶ 6.) Following the City's dissolution of the Leisure Board in July 2010, Ms. Burbaker-Clarke assumed the position of Economic Development Director with the City. (*Id.*)

After receiving approval as to location, Plaintiffs submit that Defendants took several actions that constituted unlawful discrimination under the Equal Protection Clause of the Constitution. These actions are summarized below.

    **A.**     **Pre-Festival Issues**

        **(1)**     **Festival Space Constraints**

Plaintiffs' issues began rather innocuously with space constraints. For the Festival, Plaintiffs had secured Racquets Sports Bar as a sponsor, which was going to allow the Festival to use its water and electricity free of charge. (*Id.* at ¶ 73.) However, the approved Festival area did not encompass the Bar's location, making it impossible to take advantage of these offered amenities. (*Id.* at ¶¶ 73, 74.) When Plaintiffs objected to the limits on the approved area, the Committee allegedly told Ms. Carey that they "did not give more space than that to a 'new festival.'" (*Id.* at ¶ 76.) Plaintiff alleges that Bike Time, a festival chaired by Defendant Warmington, had been given 12 blocks of space its first year. (*Id.* at ¶ 77.) At an August 5, 2010, meeting with Plaintiff, the Leisure Board decided to approve the additional 1 block of space to accommodate Plaintiffs' request, thereby solving the problem. According to Plaintiff, however, the problems continued to mount. (*Id.* at ¶¶ 78, 85.)

### (2)   Written Business and Vendor Approval

A condition of Plaintiff receiving her initial 3-block allotment of Festival space was obtaining "documentation that businesses in [the] areas [were] aware of the event with no objections." (*Id.* at ¶ 53.) Plaintiff was required to supplement this documentation when she expanded her Festival an additional block. (*Id.* at ¶ 85.) Plaintiff asserts that other festivals, including Breakwater, were not required to secure any signed approval. (*Id.* at ¶ 54–55.) Additionally, Plaintiff was required to provide contracts with vendors by mid-April 2010, which was allegedly not required of other festivals. (*Id.* at ¶ 57–58.) Defendants acknowledge these difference in treatment but state it was based on the fact that Plaintiffs requested street closures, which would directly effect business, whereas other Festivals, including Breakwater, required no such street closures. (docket # 28-1, at 5.) Additionally, Defendants note that the size of Plaintiff's proposed Festival, coupled with the City's lack of experience dealing with Ms. Carey, was also a factor. (*Id.*)

### (3)   Police Staffing Levels

Plaintiffs allege that police staffing levels were excessive when compared to previous Shoreline Festivals and other materially similar festivals. (docket # 1, at ¶ 90.) The parties agree that estimating staffing levels are generally based on the projected attendance submitted by the event organizers—in this case, Ms. Carey—and are also dependent on location, the nature of the festival, whether it encompasses a holiday, which necessitates police overtime, and so forth. Plaintiff was told the "anticipated costs" of police, together with the Department of Public Works charges, would be $34,306.86. (*Id.* at ¶ 95.) The only festival that approached this cost was Bike Time, which had an estimated attendance of 45,000, included multiple alcohol tents, and encompassed a somewhat larger geographical area than the Shoreline Spectacular. (*Id.* at ¶ 104.) Defendant argues that this

somewhat elevated cost estimate was due to Ms. Carey's initially inflated and continually fluctuating estimate of attendance, the downtown location, the street closures, the alcohol tent, and the Labor Day holiday, which would require paying police officers more overtime than typically necessary for a weekend festival. (docket #30-2.) Plaintiff disputes this argument, noting that (1) previous Shoreline Festivals generally required only 2-3 officers (compared to the 9-11 officers assigned in 2010), resulting in approximately 1/10 the cost of 2010; and (2) The Taste of Muskegon, which was in the same location as Shoreline and had 1 alcohol tent (although not on a holiday weekend), also only had 2-3 officers and was approximately 1/10 the cost. (docket # 1, at 16–18 (listing other festivals that highlight the disparity in treatment).) There is no dispute, however, that actual payment was based on the police officers and city public works resources actually used, with the total bill coming to $14,385 for services rendered. (*Id.* at ¶ 245.) Plaintiff also notes that the Breakwater Festival, held the same weekend, was not required to pay any fees for police presence. (docket # 28-1, at 5.) Defendants explain that the Breakwater Festival was projected to have smaller crowds, did not require street closures, and had no alcohol tent, and therefore did not require a special police presence. (*Id.*)

### (4) Twenty-Five Percent Down Payment Requirement

On August 5, 2010, Defendant Burbaker-Clarke notified Ms. Carey that she was required to pay 25 percent of the estimated costs for the police and public works ($ 8,577) no later than August 27, 2010, or else the Festival would not be allowed to proceed. (docket # 28, at 12.) Through interrogatories, Defendants acknowledged that "no other festival had been required to pay these costs in advance," but state that it was required due to the projected size and cost of the Festival and the City's lack of experience working with Ms. Carey. (docket # 28-2, at 2.)

Defendants were concerned as to the possibility that the City would be required to staff the Festival and would not receive payment, resulting in a loss to the City's taxpayers for hosting the Festival. (*Id.*)

### B. Issues Arising During the Festival

#### (1) Set-Up Time for Vendors

Plaintiffs assert that after receiving approval for their Festival, the problems with Defendants persisted. According to Plaintiffs, they were not allowed to close roads and set up for the Shoreline Festival until 12:01 a.m. the day of the Festival. (docket # 1, at ¶ 135.) In their Complaint, Plaintiffs note that "Bike Time, the event Mayor Warmington chaired, was given 5 days to set up, with the roads closed 2 days before. Taste of Muskegon was given 2 days to set up. Summer Celebration was given 10 days to set up. And, Irish Festival was given 5 days." (*Id.* at ¶ 136.) Defendants state that they declined to provide more set-up time because they concluded the additional closures and burden was not in the best interest of the City. (docket # 18, at 10.)

#### (2) The Liquor License

Defendants admit that Defendant Kleibecker, the Muskegon Police Chief at all times relevant to this litigation, approved a liquor license for the Festival which granted Plaintiffs the right to sell beer, wine, and spirits for the duration of the Festival. (docket # 28, at 15.) Despite this approval, police officers shutdown Plaintiffs alcohol tent multiple times during the Festival. According to Defendants, it was because "the City was unable to verify that the license, though mistakenly approved by Chief Kleibecker, was issued to permit the sale of spirits." (*Id.*) This alleged confusion resulted in the tent being closed multiple times, and resulted in the loss of alcohol sales. (docket # 1, at 22–24.) According to Plaintiffs, Defendants shut down the alcohol tent to harass Plaintiffs with

6

absolutely no basis to do so, given that Chief Kleibecker signed the permit. (*Id.*) Plaintiffs state that the tent was shutdown on Friday, Saturday, and again on Sunday, and that the police commander on duty stated Ms. Carey could "win the battle but not the war," and that he was told by Chief Kleibecker to shut her down the minute she served liquor, regardless of what the license said. (*Id.*) Defendants dispute this fact.[1]

### C. Post-Festival Issues

Following the conclusion of the Festival, "the City of Muskegon amended their Special Events Policy and provided that all Labor Day Events (and only Labor Day events) required the approval of the City Commission." (*Id.* at ¶ 219.) "This change of policy required Plaintiffs to apply for the Shoreline Spectacular 2011 in front of the City Commission as though they were a new festival, instead of as a grandfathered in festival." (*Id.* at ¶ 220.) As a practical matter, this new policy ensured Plaintiffs had to go through the entire permitting process, from scratch, each year. (*Id.* at ¶ 222.) Under this new policy, the Commission denied Plaintiffs permit request, citing an unpaid balance from the 2010 Festival bill. (*Id.* at ¶ 226.) The Commission's justification for the new policy was that "Labor Day falls at the end of a traditionally festival-heavy summer, and resources are spread thin." (*Id.* at ¶ 233.)

Plaintiffs believe the new Policy and reason for denying the 2011 application both constitute unlawful discrimination. In support of this position, Plaintiffs notes that the Irish Festival, which occurs 3 weeks after Labor Day, was not subject to the same requirements, and attributes this disparity to the fact that Defendants Warmington and Mazade served on the Irish Festival Board.

---

[1] The alleged unlawful deprivation of the Liquor License by Defendants is the subject of a Due Process claim in the present matter, which the Court previously determined survives Defendants' Motion for Summary Judgment.

7

(*Id.* at ¶ 234). Plaintiff also notes that other festivals, including Defendant Warmington's Summer Celebration, are granted festival permits while still maintaining outstanding balances due to the City, allowing the festival promoters to pay off the balance on an installment basis. (*Id.* at 229–30.) For example, according to Plaintiff, the Summer Celebration owes the City approximately $90,000 for three years' worth of fees. (*Id.* at ¶ 230.) Defendants again note that Plaintiff's lack of experience promoting and running festivals in the community justified its approach to the extent it differed from other festivals, and also note that Labor Day weekend, as a holiday weekend, puts additional strains on police staffing not at issue on other weekends at the end of summer and into the fall. (docket # 18.)

## ANALYSIS

The only remaining issue raised in Defendants' Motion for Summary Judgment is whether Plaintiffs' class-of-one Equal Protection claims against the City, the Commission, and the individual Defendants in their respective official capacities states a cognizable cause of action under federal law. Plaintiffs argue that Defendants singled out the Shoreline Festival for no rational reason and that their actions were motivated by personal animus. Defendants argue that no such personal animus existed, and in any event, that they were vested with discretionary authority in their permitting decisions, and the class of one theory is therefore not legally cognizable as a matter of law. Alternatively, Defendants argue that even if the class-of-one theory is available, Plaintiffs claim must nevertheless fail because Defendants have articulated a rational basis for their actions involving Plaintiffs' Festival.

Under the Equal Protection Clause, "the states cannot make distinctions [that] . . . burden a fundamental right, target a suspect class, or intentionally treat one different from others similarly

situated without any rational basis for the difference." *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 312 (6th Cir. 2005); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "Where, as here, a plaintiff alleges a violation of the third type, it is said to proceed on a 'class of one' theory." *Taylor Acquisitions, L.L.C v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)); *see also Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010). Under this theory, a "plaintiff may demonstrate that government action lacks a rational basis either by negativing every conceivable basis which might support government action, or by showing that the challenged action was motivated by animus or ill-will." *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th 2005).

  The United States Supreme Court first recognized the class-of-one equal protection theory of liability in *Willowbrook v. Olech*, 528 U.S. 562 (2000). Grace and Thaddeus Olech had petitioned the Village of Willowbrook (the "Village") to connect their property to the municipal water supply. *Id.* at 563. The Village conditioned the connection on the Olechs granting it a 33-foot easement. *Id.* The Olechs objected, asserting that other property owners requesting access to the Village water supply were only required to provide a 15-foot easement. *Id.* After a three-month delay, the Village agreed to provide the Olechs with a connection in return for the 15-foot easement. *Id.* Shortly thereafter, the Olechs filed suit, "claiming that the Village's demand of an additional 18-foot easement violated the Equal Protection clause of the Fourteenth Amendment." *Id.* The District Court dismissed the Complaint under Rule 12(b)(6) for failing to state a claim, but the Seventh Circuit Court reversed. In a four-page per curiam opinion, the Supreme Court held that the Olechs had stated a cognizable "class of one" equal protection claim because they alleged the Village had

intentionally treated them differently from others similarly situated, "quite apart from the Village's subjective motivation," and that there was no rational basis for the difference in treatment. *Id.*

The Supreme Court did not revisit the class-of-one theory until eight years later in *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591 (2008), in the public employment context. In *Engquist*, the Supreme Court held that the class-of-one theory did not apply to government's decisions regarding employment as a matter of law. *Id.* In reaching its decision, the Supreme Court "did not disturb the holding or the rationales of *Olech* and its predecessors, because it agreed that a class-of-one claim is generally available to one who alleges that a government discriminated against him by irrationally departing from a clear, objective standard." *JDC Management, LLC v. Reich*, 644 F. Supp. 2d 905, 920–21 (W.D. Mich. 2009). In *Olech*, the aggrieved party asserted that all property owners applying for water connection were required to provide a 15-foot easement, but that they were required to provide a 33-foot easement. This clear, objective departure from the alleged standard easement requirement permitted a class-of-one equal protection claim to survive a Rule 12(b)(6) challenge.

However, the Supreme Court distinguished *Olech* from cases that involve inherently discretionary decisions involving subjective, individual-specific determinations. As Chief Justice Roberts, writing for the majority, explained:

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that "people should be treated alike, under like circumstances and conditions," is not violated when one person is treated differently than others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Engquist*, 553 U.S. at 603. While Chief Justice Roberts noted that "this principle applies most clearly in the employment context," it was not limited to employment. *Id.* at 604. In short, an inescapable consequence of committing some governmental decisions to the discretion of the decision-maker, rather than to the rigors of an objective and verifiable standard, is some deferential treatment.

Relying on this principle, numerous courts, including several within this District, have declined to extend the class-of-one theory to alleged conduct that involves the same type of discretionary, subjective decision-making that was present in *Engquist*. *See, e.g.*, *Argue v. Burnett*, 2010 WL 1417633, at *14 (W.D. Mich. Apr. 1, 2010) (Maloney, C.J.); *JDC Management, LLC*, 644 F. Supp. 2d at 925 (Maloney, C.J.); *Green v. Livingston*, 2009 WL 1788319, at * 4 (W.D. Mich. June 19, 2009) (Bell, J.) (holding class-of-one theory was inapplicable to parole board decision to grant or deny parole); *Robertson v. City of Grand Rapids*, 2008 WL 4822218, at *9–*10 (W.D. Mich. Nov. 4, 2008) (Scoville, M.J.) ("[I]n *Engquist* . . . [t]he Supreme Court held that the 'class-of-one' theory was not appropriate for areas involving discretionary determinations . . . ."); *Gast v. Tenn. Valley Authority*, 2011 WL 864390, at *9 (Mar. 10, 2011); *see also U.S. v. Moore*, 543 F.3d 891, 900 (7th Cir. 2008) ("[The] class-of-one equal protection theory is a 'poor fit' where the challenged governmental action is the product of a broadly discretionary decision-making process."); *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("The *Olech* class of one suit serves an important but relatively narrow function. It is not a vehicle for federalizing run-of-the-mill zoning, environmental, and licensing decisions."); *Crippen v. Township of Hempstead*, 2009 WL 803117 (E.D.N.Y. Mar. 25, 2009) (requiring plaintiff to demonstrate that differential treatment was the result of non-discretionary state action to proceed on class-of-one claim); *Seymour's Boardyard, Inc. v.*

11

*Town of Huntington*, 2009 WL 1514610 (E.D.N.Y. June 1, 2009) (holding township's decision to revoke plaintiff's license to operate a boat launch was not subject to class-of-one analysis); *Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 112 (W.D.N.Y. 2009) (class-of-one challenge to town code provisions governing rental property was not subject to class-of-one analysis based on inherent discretionary authority of township); *Upthegrove v. Holm*, 2009 WL 1296969, at *1 (W.D. Wisc. May 7, 2009) (holding class-of-one theory inapplicable to prison employee's decision regarding inmate dress); *Bissessur v. Ind. Univ. Bd. of Trustees*, 2008 WL 4274451, at *9 (S.D. Ind. Sept. 10, 2008) (holding *Engquist* bars class-of-one challenge to school district's decision to expel student); *Siao-Pao v. Connolly*, 564 F. Supp. 2d 232, 245 (S.D.N.Y. 2008) (holding *Engquist* bars challenge to parole board's decision to deny parole); *Harmon v. St. Louis Cty.*, 2009 WL 880024 (E.D.Mo. Mar. 30, 2009) (dismissing class-of-one claim based on plaintiff's alleged mistreatment after automobile accident with a county police officer). These cases ensure that discretionary governmental action remains truly discretionary and beyond the scope of judicial second-guessing.

*Engquist* involved an employment decision, not a permitting decision, but the reasoning of *Engquist* applies with equal force in both scenarios, and the Court sees no principled basis to distinguish between them. It is undisputed that the City and the Commission are vested with the discretionary authority to grant or deny festival permits. It is also undisputed that a number of subjective factors inform whether a permit should ultimately issue. The evidence of record bolsters these conclusions, with a number of subjective and discretionary considerations informing the permitting process, including the projected attendance, location, date availability, past involvement with the festival promoter applying for the license, and potential benefit or risks to the City. The record does not disclose the kind of objectively verifiable standards, like the *Olech* easement, that

dictate the grant or the denial of a permitting decision. Applying the class-of-one analysis to such a discretionary, subjective decision would require the Court to serve as a "super-legislature," second-guessing the decision-making of elected and appointed officials based on a disfavorable outcome to a particular party. As the Tenth Circuit cautioned before *Engquist* was even decided:

> unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decisions made by state actors. It is always possible for persons aggrieved by government to allege, and almost always possible to produce evidence, that they were treated differently than others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decision-making: a role that is both ill suited to the federal courts and offensive to state and local autonomy in our federal system.

*Jennings v. City of Stillwater*, 383 F.3d 1199, 1210–11 (10th Cir. 2004).

After reviewing all relevant matters of record, the Court is persuaded that the class-of-one theory is not legally applicable to Defendants' actions in this matter. Defendants were vested with the discretion to decide whether to grant Plaintiffs a Festival license, the location of the Festival, the police presence required, and what accommodation to provide to Plaintiffs for the Festival's operation. Defendants exercised this discretion, ultimately granting Plaintiffs a permit for their Festival on Labor Day weekend 2010. Plaintiffs certainly take issue with some of the conditions placed on their Festival, most notably the police presence and advance payment requirement, as well as the Commission's decision to modify the permit application process for the following year, but these decisions are well within the ambit of discretion and are not subject to the class-of-one theory. Moreover, to the extent Plaintiffs' grievance relates to the Liquor License or other property interest,

the Due Process claim that has already survived summary judgment is the appropriate vehicle for relief, not the class-of-one theory that is addressed here.

Plaintiffs argue that the Sixth Circuit's unpublished decision in *Franks v. Rubitschun*, 312 Fed. App'x 764 (6th Cir. 2009), supports the conclusion that their class-of-one theory may indeed apply to Defendants' discretionary decision-making in this case. In *Franks,* a pro se prisoner had brought a section 1983 action against various state actors, challenging their decision to deny him parole. *Id.* at 765–66. The Sixth Circuit concluded that the prisoner's complaint, liberally construed, pled a class-of-one theory, and remanded the case to allow the district court to address this theory in the first instance. *Id.* at 766. In a footnote, the Sixth Circuit noted that *Engquist* arose in the public-employment context, and "suggests that *Engquist*'s discussion of discretionary decision-making should not control the case at hand." *Id.* at 766 n.3. Plaintiffs reliance on this footnote in support of their position is unpersuasive, however. Notably, after remand, the district court conducted the required analysis and, relying on the *Engquist* reasoning articulated above, concluded that the class-of-one theory was not cognizable as a matter of law due to the discretionary decision-making inherent in the parole process. *Franks v. Rubitschun*, 2010 WL 1424253, at *8 (W.D. Mich. Mar. 31, 2010) (Maloney, C.J.) In addressing the footnote, Chief Judge Maloney correctly noted that "the Sixth Circuit's interpretation of *Enquist* in *Franks* was unnecessary to its disposition of the appeal, and, thus, was dicta, which has no precedential effect." *Id.* The Court is similarly unpersuaded by the dicta in *Franks,* and declines to adopt its suggested approach in the present case.

Plaintiff alternatively suggests that while *Engquist* may have eliminated the class-of-one theory in cases where the state actor simply lacked a rational basis for its discretionary decision-making, it did not eliminate the theory in cases where the state actor took action in bad faith or with

14

personal animus, as Plaintiffs say happened here. The case law does not support the argument in the way Plaintiffs suggest. To the contrary, the Supreme Court has not distinguished between types of class-of-one cases, as the plaintiff in *Enquist* alleged that the defendant employer decision was based on "arbitrary, vindictive, and malicious reasons," but the Supreme Court nevertheless precluded the plaintiff from pursuing a class-of-one theory of liability because of the inherently discretionary nature of the decision-making. *See Argue*, 2010 WL 1417633 at *12 (citing *Lewis v. Binegar*, 2009 WL 1272109, at *2 (C.D. Ill. May 6, 2009)). Any other result would effectively open the door to judicial second-guessing of virtually all municipal permitting decisions on Equal Protection grounds.[2]

## CONCLUSION

For the reasons set forth above, the Court concludes that the class-of-one claims against the City, the Commission, and the Individual Defendants fail as a matter of law, because the harm alleged is based on discretionary, subjective decision-making related to a license that Defendants had authority to grant or deny.

**IT IS SO ORDERED**.


Dated:     August 16, 2012              /s/ Robert J. Jonker
                                        ROBERT J. JONKER
                                        UNITED STATES DISTRICT JUDGE

---

[2] Of course, even purely discretionary governmental decision-making remains appropriately subject to challenge when a plaintiff alleges and supports a claim that the discretionary decision was infected with racial animus, retaliatory motive or other similar discrimination prohibited by law. These are not the claims in this case. The only claim here rests on a general class-of-one theory that Plaintiffs are unhappy with the discretionary permit conditions imposed on them when compared with other permit holders.